154 F.3d 426
 332 U.S.App.D.C. 104, 29 Envtl. L. Rep. 20,202
 ANIMAL LEGAL DEFENSE FUND, INC., et al., Appellees,
v.
Daniel R. GLICKMAN, Secretary of Agriculture, et al., and
National Association for Biomedical Research, Appellants.
 Nos. 97-5009, 97-5031 and 97-5074
 United States Court of Appeals,
District of Columbia Circuit.
 Argued in banc May 13, 1998.
Decided Sept. 1, 1998.
 
 [332 U.S.App.D.C. 106] Appeals from the United States District Court for the District of Columbia (No. 96cv00408).
 Stephen W. Preston, Deputy Assistant Attorney General, United States Department of Justice, argued the cause for appellants Daniel R. Glickman, et al., with whom Frank W. Hunger, Assistant Attorney General, Wilma A. Lewis, United States Attorney, Eric H. Holder, Jr., United States Attorney at the time the briefs were filed, Michael Jay Singer and John S. Koppel, Attorneys, were on the briefs.
 Harris Weinstein argued the cause for appellant National Association for Biomedical Research, with whom Michael G. Michaelson and Gail H. Javitt were on the briefs.
 Katherine A. Meyer argued the cause for appellees, with whom Valerie J. Stanley was on the briefs.
 Andrew L. Frey was on the briefs for amicus curiae Pharmaceutical Research and Manufacturers of America.
 Leslie G. Landau, Susan Hoffman and Tiffany R. Hedgpeth were on the briefs for amicus curiae The Jane Goodall Institute for Wildlife Research, Education and Conservation.
 Before: EDWARDS, Chief Judge, WALD, SILBERMAN, WILLIAMS, GINSBURG, SENTELLE, HENDERSON, RANDOLPH, ROGERS, TATEL and GARLAND, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WALD.
 Dissenting Opinion filed by Circuit Judge SENTELLE, with whom SILBERMAN, GINSBURG and KAREN LeCRAFT HENDERSON, Circuit Judges, join.
 WALD, Circuit Judge:
 
 
 1
 The 1985 amendments to the Animal Welfare Act ("AWA") direct the Secretary of Agriculture to "promulgate standards to govern the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors." Pub.L. No. 99-198, § 1752, 99 Stat. 1354, 1645 (1985) (codified at 7 U.S.C. § 2143(a) (1994)). They further provide that such standards "shall include minimum requirements" for, inter alia, "a physical environment adequate to promote the psychological well-being of primates." Id. Pursuant to this authority, the United States Department of Agriculture ("USDA") issued regulations for primate dealers, exhibitors, and research facilities that included a small number of mandatory requirements and also required the regulated parties to "develop, document, and follow an appropriate plan for environment enhancement adequate to promote the psychological well-being of nonhuman primates. The plan must be in accordance with the currently accepted professional standards as cited in appropriate professional journals or reference guides, and as directed by the attending veterinarian." 9 C.F.R. § 3.81 (1997). Although these plans must be made available to the USDA, the regulated parties are not obligated to make them available to members of the public. See id.
 
 
 2
 The individual plaintiffs, Roseann Circelli, Mary Eagan, and Marc Jurnove,[1] challenge these regulations on the ground that they violate the USDA's statutory mandate under the AWA and permit dealers, exhibitors, and research facilities to keep primates under inhumane conditions. The individual plaintiffs allege that they suffered aesthetic injury during their regular visits to animal exhibitions when they observed primates living under such conditions.[2] A divided panel of this [332 U.S.App.D.C. 107] court held that all of the plaintiffs lacked constitutional standing to pursue their claims. See Animal Legal Defense Fund, Inc. v. Glickman, 130 F.3d 464, 466 (D.C.Cir.1997). This court subsequently vacated that judgment and granted rehearing in banc.
 
 
 3
 We hold that Mr. Jurnove, one of the individual plaintiffs, has standing to sue. Accordingly, we need not pass on the standing of the other individual plaintiffs. See Mountain States Legal Found. v. Glickman, 92 F.3d 1228, 1232 (D.C.Cir.1996) ("For each claim, if constitutional and prudential standing can be shown for at least one plaintiff, we need not consider the standing of the other plaintiffs to raise that claim."). We leave consideration of the merits of the individual plaintiffs' case to a future panel of this court to be selected by the usual means.
 
 I. BACKGROUND
 A. Marc Jurnove's Affidavit
 
 4
 Mr. Jurnove's affidavit is an uncontested statement of the injuries that he has suffered to his aesthetic interest in observing animals living under humane conditions. See Animal Legal Defense Fund, Inc. v. Glickman, 943 F.Supp. 44, 49 (D.D.C.1996) (granting summary judgment to plaintiffs on all legal claims except one that plaintiffs have not appealed; defendants did not allege any genuine disputes of material fact, but instead moved only to dismiss for lack of standing).
 
 
 5
 For his entire adult life, Mr. Jurnove has "been employed and/or worked as a volunteer for various human and animal relief and rescue organizations." Jurnove Affidavit p 3. "By virtue of [his] training in wildlife rehabilitation and [his] experience in investigating complaints about the treatment of wildlife, [he is] very familiar with the needs of and proper treatment of wildlife." Id. p 6. "Because of [his] familiarity with and love of exotic animals, as well as for recreational and educational purposes and because [he] appreciate[s] these animals' beauty, [he] enjoy[s] seeing them in various zoos and other parks near [his] home." Id. p 7.
 
 
 6
 Between May 1995 and June 1996, when he filed his affidavit, Mr. Jurnove visited the Long Island Game Farm Park and Zoo ("Game Farm") at least nine times. Throughout this period, and since as far back as 1992, the USDA has not questioned the adequacy of this facility's plan for the psychological well-being of primates.
 
 
 7
 Mr. Jurnove's first visit to the Game Farm, in May 1995, lasted approximately six hours. See id. While there, Mr. Jurnove saw many animals living under inhumane conditions. For instance, the Game Farm housed one primate, a Japanese Snow Macaque, in a cage "that was a distance from and not in view of the other primate cages." Id. p 14. "The only cage enrichment device this animal had was an unused swing." Id. Similarly, Mr. Jurnove "saw a large male chimpanzee named Barney in a holding area by himself. He could not see or hear any other primate." Id. p 8. Mr. Jurnove "kn[e]w that chimpanzees are very social animals and it upset [him] very much to see [Barney] in isolation from other primates." Id. The Game Farm also placed adult bears next to squirrel monkeys, although Jurnove saw evidence that the arrangement made the monkeys frightened and extremely agitated. See id. p 11.
 
 
 8
 The day after this visit, Mr. Jurnove began to contact government agencies, including the USDA, in order to secure help for these animals. Based on Mr. Jurnove's complaint, the USDA inspected the Game Farm on May 3, 1995. According to Mr. Jurnove's uncontested affidavit, however, the agency's resulting inspection report "states that [the USDA inspectors] found the facility in compliance with all the standards." Id. p 18. Mr. Jurnove returned to the Game Farm on eight more occasions to observe these officially legal conditions.
 
 
 9
 On July 17, 18, and 19, 1995, he found "virtually the same conditions" that allegedly caused him aesthetic injury during his first visit to the Game Farm in May. Id. p 20. For instance, Barney, the chimpanzee, and Samantha, the Japanese Snow Macaque, were still alone in their cages. See id. This [332 U.S.App.D.C. 108] time, Mr. Jurnove documented these conditions with photographs and sent them to the USDA. See id. pp 19-20. Nevertheless, the responding USDA inspectors found only a few violations at the Game Farm; they reported "nothing" about many of the conditions that concerned Mr. Jurnove and that he had told the agency about, such as "the fact that numerous primates were being housed alone" and the lack of adequate stimulation in their cages. Id. p 21.
 
 
 10
 Mr. Jurnove devoted two trips in August and one in September to "videotaping the conditions that the inspection missed," and on each trip he found that the inhumane conditions persisted. Id. pp 22-28. At the end of September, the USDA sent three inspectors to the Game Farm in response to Mr. Jurnove's continued complaints and reportage; they found violations, however, only with regard to the facility's fencing. See id. p 29.
 
 
 11
 Mr. Jurnove returned to the Game Farm once more on October 1, 1995. Indeed, he only stopped his frequent visits when he became ill and required major surgery. See id. p 30. After his health returned, Mr. Jurnove visited the Game Farm in April 1996, hoping to see improvements in the conditions that he had repeatedly brought to the USDA's attention. He was disappointed again; "the animals [were] in literally the same conditions as [he] had seen them over the summer of 1995." Id. p 33. Mr. Jurnove's resulting complaints prompted the USDA to inspect the Game Farm in late May 1996. For the fourth time, the agency found the facility largely in compliance, with a few exceptions not relevant to the plaintiffs' main challenge in this case. See id. p 42. In June 1996, Mr. Jurnove filed the affidavit that is the basis of his claim here. He concluded this affidavit by stating his intent to "return to the Farm in the next several weeks" and to "continue visiting the Farm to see the animals there." Id. p 43.
 
 B. The Plaintiffs' Complaint
 
 12
 The plaintiffs' complaint elaborates a two-part legal theory based on the factual allegations in the individual plaintiffs' affidavits. First, the plaintiffs allege that the AWA requires the USDA to adopt specific, minimum standards to protect primates' psychological well-being, and the agency has failed to do so. See, e.g., First Amended Complaint p 97 ("In issuing final Part 3 regulations, USDA violated its statutory obligation [under 7 U.S.C. § 2143(a)(2)(B) ] to set standards 'for a physical environment adequate to promote the psychological well-being of primates,' and instead delegated this responsibility to regulated entities by requiring that regulated entities devise 'plans' for this purpose."); id. p 106 ("Instead of issuing the standards on this topic, USDA's regulation [at 9 C.F.R. § 3.81] simply states that the 'plans' must be in accordance with currently accepted professional standards."); id. p 107 ("By providing that animal exhibitors and other regulated entities shall develop their own 'plans' for a physical environment adequate to promote the psychological well-being of non-human primates, USDA has failed to satisfy the statutory requirement that it set the 'minimum' standards.").
 
 
 13
 Second, the plaintiffs contend that the conditions that caused Mr. Jurnove aesthetic injury complied with current USDA regulations, but that lawful regulations would have prohibited those conditions and protected Mr. Jurnove from the injuries that he describes in his affidavit. See id. p 53 ("Marc Jurnove has been and continues to be injured by USDA's failure to issue and implement standards for a physical environment adequate to promote the psychological well-being of primates because this harms the nonhuman primates he sees at the Long Island Game Farm and Zoo which in turn caused and causes him extreme aesthetic harm and emotional and physical distress."); id. ("[B]ecause USDA regulations permit the nonhuman primates in zoos, such as the Long Island Game Farm and Zoological Park to be housed in isolation, Marc Jurnove was exposed to and will be exposed in the future to behaviors exhibited by these animals which indicate the psychological debilitation caused by social deprivation. Observing these behaviors caused and will cause Marc Jurnove personal distress and aesthetic and emotional injury."); id. p 58 ("Marc Jurnove experienced and continues to experience [332 U.S.App.D.C. 109] physical and mental distress when he realizes that he, by himself, is powerless to help the animals he witnesses suffering when such suffering derives from or is traceable to the improper implementation and enforcement of the Animal Welfare Act by USDA.").[3]
 
 C. Procedural History
 
 14
 The United States District Court, Judge Charles R. Richey, held that the individual plaintiffs had standing to sue, finding in their favor on a motion for summary judgment. See 943 F.Supp. at 54-57.[4] On the merits, the district court held that 9 C.F.R. § 3.81 violates the Administrative Procedure Act ("APA") because it fails to set standards, including minimum requirements, as mandated by the AWA; that the USDA's failure to promulgate standards for a physical environment adequate to promote the psychological well-being of primates constitutes agency action unlawfully withheld and unreasonably delayed in violation of the APA; and that the USDA's failure to issue a regulation promoting the social grouping of nonhuman primates is arbitrary, capricious, and an abuse of discretion in violation of the APA. See id. at 59-61.
 
 
 15
 A split panel of this court held that none of the plaintiffs had standing to sue and accordingly did not reach the merits of their complaint. See 130 F.3d at 466. This court granted rehearing in banc, limited to the question of Marc Jurnove's standing.
 
 II. ANALYSIS
 
 16
 "The question of standing involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." Bennett v. Spear, 520 U.S. 154, 117 S.Ct. 1154, 1161, 137 L.Ed.2d 281 (1997) (citation and quotation marks omitted). To meet the "case or controversy" requirement of Article III, a plaintiff must demonstrate: (1) that she has suffered "injury in fact;" (2) that the injury is "fairly traceable" to the defendant's actions; and (3) that a favorable judicial ruling will "likely" redress the plaintiff's injury. Id.; see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In addition, the Supreme Court has recognized prudential requirements for standing, including "that a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." Bennett, 117 S.Ct. at 1161.
 
 
 17
 We find that Mr. Jurnove's allegations fall well within these requirements.
 
 A. Injury in Fact
 
 18
 Mr. Jurnove's allegations solidly establish injury in fact. As his affidavit indicates, Mr. Jurnove "enjoy[s] seeing [animals] in various zoos and other parks near [his] home" "[b]ecause of [his] familiarity with and love of exotic animals, as well as for recreational and educational purposes and because [he] appreciate[s] these animals' beauty." Jurnove Affidavit p 7. He decided to tour the primate cages at the Game Farm "in furtherance of [his] appreciation for exotic animals and [his] desire to observe and enjoy them." Id. During this tour and the ones that followed, Mr. Jurnove suffered direct, concrete, and particularized injury to this aesthetic interest in observing animals living under humane conditions. At this particular zoo, which he has regularly visited and plans to keep visiting, he saw particular animals enduring inhumane treatment. He developed an interest, moreover, in seeing these particular animals living under humane treatment. [332 U.S.App.D.C. 110] As he explained, "[w]hat I observed [at the Game Farm] was an assault on my senses and greatly impaired my ability to observe and enjoy these captive animals." Id. p 17 (emphasis added). "I want to observe, study, and enjoy these animals in humane conditions." Id. p 43.
 
 
 19
 Simply put, Mr. Jurnove has alleged far more than an abstract, and uncognizable, interest in seeing the law enforced. See Allen v. Wright, 468 U.S. 737, 754, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) ("This Court has repeatedly held that an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court."); Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 223 n. 13, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974) (rejecting standing of plaintiffs who alleged nothing but "the abstract injury in nonobservance of the Constitution"); Humane Society v. Hodel, 840 F.2d 45, 51-52 (D.C.Cir.1988). To the contrary, Mr. Jurnove has made clear that he has an aesthetic interest in seeing exotic animals living in a nurturing habitat, and that he has attempted to exercise this interest by repeatedly visiting a particular animal exhibition to observe particular animals there. This interest was allegedly injured, however, when Mr. Jurnove witnessed the actual living conditions of the primates described and named in his affidavit. It is, of course, quite possible that many other people might visit the same zoo, observe the same animals there, and suffer similar injuries upon seeing these animals living under inhumane conditions. But the fact that many may share an aesthetic interest does not make it less cognizable, less "distinct and palpable." Allen, 468 U.S. at 751, 104 S.Ct. 3315 (citation and quotation marks omitted); Clinton v. City of New York, 524 U.S. 417, ---- - ----, 118 S.Ct. 2091, 2101-02, 141 L.Ed.2d 393 (1998) ("[It is a] self-evident proposition that more than one party may have standing to challenge a particular action or inaction. Once it is determined that a particular plaintiff is harmed by the defendant, and that the harm will likely be redressed by a favorable decision, that plaintiff has standing--regardless of whether there are others who would also have standing to sue."); FEC v. Akins, 524 U.S. 11, ----, 118 S.Ct. 1777, 1786, 141 L.Ed.2d 10 (1998) ("Often the fact that an interest is abstract and the fact that it is widely shared go hand in hand. But their association is not invariable, and where a harm is concrete, though widely shared, the Court has found 'injury in fact.' "); United States v. SCRAP, 412 U.S. 669, 688, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) ("To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody."); Sierra Club v. Morton, 405 U.S. 727, 734, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) ("Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process.").
 
 
 20
 The Supreme Court has repeatedly made clear that injury to an aesthetic interest in the observation of animals is sufficient to satisfy the demands of Article III standing. Defenders of Wildlife states explicitly that "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." 504 U.S. at 562-63, 112 S.Ct. 2130 (emphasis added). Similarly, in Japan Whaling Association v. American Cetacean Society, 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986), the Court found that the plaintiffs had "undoubtedly ... alleged a sufficient 'injury in fact' in that the whale watching and studying of their members will be adversely affected by continued whale harvesting," id. at 231 n. 4, 106 S.Ct. 2860 (citing Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973)); see also Animal Legal Defense Fund, Inc. v. Espy ("ALDF I"), 23 F.3d 496, 505 (D.C.Cir.1994) (Williams, J., concurring in part and dissenting in part) ("Japan Whaling Association and Defenders of Wildlife clearly recognize people's affirmative aesthetic interest in viewing animals enjoying their natural habitat.").
 
 
 21
 [332 U.S.App.D.C. 111] The key requirement, one that Mr. Jurnove clearly satisfies, is that the plaintiff have suffered his injury in a personal and individual way--for instance, by seeing with his own eyes the particular animals whose condition caused him aesthetic injury. As the Supreme Court noted in Defenders of Wildlife, "[i]t is clear that the person who observes or works with a particular animal threatened by a federal decision is facing perceptible harm." 504 U.S. at 566, 112 S.Ct. 2130 (emphasis added); see also id. at 582 & 584 n. 2, 112 S.Ct. 2130 (Stevens, J., concurring in the judgment) ("In my opinion a person who has visited the critical habitat of an endangered species, has a professional interest in preserving the species and its habitat, and intends to revisit them in the future has standing to challenge agency action that threatens their destruction.... [R]espondents would not be injured by the challenged projects if they had not visited the sites or studied the threatened species and habitat.") (emphasis added); Animal Legal Defense Fund, Inc. v. Espy ("ALDF II"), 29 F.3d 720, 726 (D.C.Cir.1994) (Mikva, C.J., concurring) ("Had the [plaintiffs] challenging the Secretary's regulations alleged an interest in protecting the well-being of specific laboratory animals (an interest predating this litigation), I think [the plaintiffs] would have had standing to challenge those regulations for providing insufficient protection to the animals.") (emphasis added); Didrickson v. United States Dep't of the Interior, 982 F.2d 1332, 1340-41 (9th Cir.1992) (finding standing where plaintiffs "declared that they have observed, enjoyed and studied sea otters in specific areas in Alaska.... The [plaintiffs] are concerned with action harming sea otters in Alaska, where [they] live and in particular areas that they frequent, unlike the declarants in Defenders of Wildlife.") (emphasis added); cf. Defenders of Wildlife, 504 U.S. at 567, 112 S.Ct. 2130 ("It goes beyond the limit, however, and into pure speculation and fantasy, to say that anyone who observes or works with an endangered species, anywhere in the world, is appreciably harmed by a single project affecting some portion of that species with which he has no more specific connection.").
 
 
 22
 This court's precedent, moreover, specifically recognizes that people have a cognizable interest in "view[ing] animals free from ... 'inhumane treatment.' " Humane Society v. Babbitt, 46 F.3d 93, 99 n. 7 (D.C.Cir.1995) (quoting Animal Welfare Institute v. Kreps, 561 F.2d 1002, 1007 (D.C.Cir.1977)); see also ALDF I, 23 F.3d at 505 (Williams, J., concurring in part and dissenting in part) ("Our own cases have indicated a recognition of people's interest in seeing animals free from inhumane treatment."). In Animal Welfare Institute v. Kreps, 561 F.2d 1002 (D.C.Cir.1977), the plaintiff organizations alleged, inter alia, an interest in "enjoy[ing] Cape fur seals alive in their natural habitat under conditions in which the animals are not subject to ... inhumane treatment," id. at 1007 (citation and quotation marks omitted). This court held that these plaintiffs' aesthetic interests satisfied the requirements of standing. See id. at 1007-10.[5] Similarly, Humane Society v. Hodel found standing based on a complaint "that the existence of hunting on wildlife refuges forces Society members to [332 U.S.App.D.C. 112] witness animal corpses and environmental degradation, in addition to depleting the supply of animals and birds that refuge visitors seek to view," 840 F.2d at 52. As this Court noted, "[t]hese are classic aesthetic interests, which have always enjoyed protection under standing analysis." Id.[6]
 
 
 23
 The Ninth Circuit has similarly recognized an aesthetic interest in observing animals living under humane conditions. In Fund for Animals, Inc. v. Lujan, 962 F.2d 1391 (9th Cir.1992), the plaintiffs alleged aesthetic injuries stemming from the mistreatment of bison, who were subject to a population management plan that operated by shooting animals who strayed outside the boundaries of Yellowstone. In finding standing, the court observed "that the Fund's members had standing to sue because of the psychological injury they suffered from viewing the killing of the bison in Montana. Mr. Pacelle testified that several Fund members had been emotionally harmed when they saw bison 'who were just standing outside the boundary of the park shot and crumbled [sic] to their feet.' " Id. at 1396 (quoting testimony and citing Humane Society v. Hodel, 840 F.2d 45 (D.C.Cir.1988)).[7]
 
 
 24
 Analogously, the Supreme Court and this circuit have frequently recognized the injury in fact of plaintiffs who suffered aesthetic injury stemming from the condition and quality, or despoliation, of an environmental area that they used. In Mountain States Legal Foundation, for instance, the plaintiffs asserted injury flowing from government action that would allegedly make the Kootenai National Forest more vulnerable to forest fire. This court found an "aesthetic and environmental [332 U.S.App.D.C. 113] interest[ ] in having such areas free of devastating forest fire ... clearly sufficient for Article III standing." 92 F.3d at 1234. Similarly, in Montgomery Environmental Coalition v. Costle, 646 F.2d 568 (D.C.Cir.1980), the plaintiffs challenged the Environmental Protection Agency's ("EPA's") regulation of "two sewage treatment plants that discharge pollutants into the Potomac River and its tributaries," id. at 573. They "profess[ed] an interest in the preservation and enhancement of the natural environment situated along the Potomac estuary," id. at 576, and alleged that the EPA had issued "permits too lax to protect the water quality of the Potomac," id. at 573. This court found standing. See id. at 578. Committee for Auto Responsibility v. Solomon, 603 F.2d 992 (D.C.Cir.1979) (per curiam), involved "a challenge to the leasing by the General Services Administration (GSA) of the Great Plaza area of the Federal Triangle in Washington, D.C., for use as a parking facility for employees of federal agencies," id. at 996. Plaintiffs, "two organizations whose purposes include improvement of the quality of the environment, together with three individuals who live and attend school in the District of Columbia," id. at 997, successfully established injury in fact based on allegations that they were "affected by noise, air pollution and congestion from vehicles utilizing the Great Plaza parking lot," id. at 998. In Lujan v. National Wildlife Federation, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), the plaintiffs challenged federal action that allegedly "threaten[ed] the aesthetic beauty and wildlife habitat potential" of the South Pass-Green Mountain area of Wyoming, id. at 886, 110 S.Ct. 3177 (citation and quotation marks omitted). The Supreme Court stated that it had "no doubt" that this threat could constitute aesthetic injury under Article III, noting that "[t]he only issue" was whether the individual plaintiffs in the case had established that their interests "were actually affected." Id.; see also id. at 901 n. 2, 110 S.Ct. 3177 (Blackmun, J., dissenting) (arguing that plaintiffs had established their standing and observing that "[a Bureau of Land Management] Mineral Report issued June 17, 1982, concluded that mining and associated activities 'could have an adverse impact on crucial moose habitat, deer habitat, some elk habitat, and a variety of small game and bird species. Improvements at campgrounds, as well as land in the immediate vicinity, could either be damaged or destroyed.' ") (citation omitted).
 
 
 25
 Indeed, Humane Society v. Hodel, which recognized an aesthetic interest in seeing animals living under humane conditions, explicitly acknowledged the usefulness of analogizing such an aesthetic interest to a plaintiff's interest in the condition of an environmental area that he uses. That case drew on our opinion in National Wildlife Federation v. Hodel, 839 F.2d 694 (D.C.Cir.1988), which held that a wildlife organization had standing to challenge regulations that allegedly threatened to degrade the environment, see id. at 703-16. The Humane Society court noted that the two cases involved "strikingly analogous" injuries, explaining: "There the National Wildlife Federation's standing rested in part on the aesthetic injuries to those members who complained of viewing degraded landscapes, and here the Humane Society's standing similarly rests on the aesthetic injuries to members who complain of viewing the despoliation of animals." 840 F.2d at 52 (citations omitted).
 
 
 26
 In the environmental context, too, however, plaintiffs must establish that they have actually used or plan to use the allegedly degraded environmental area in question. It is this failure to show such direct use that has resulted in the denial of standing in several high-profile environmental cases. For instance, the injury alleged in Sierra Club v. Morton would have been "incurred entirely by reason of the change in the uses to which Mineral King [Valley] will be put, and the attendant change in the aesthetics and ecology of the area." 405 U.S. at 734, 92 S.Ct. 1361. Specifically, the Sierra Club alleged that the challenged development of the Valley " 'would destroy or otherwise adversely affect the scenery, natural and historic objects and wildlife of the park and would impair the enjoyment of the park for future [332 U.S.App.D.C. 114] generations.' " Id. (emphasis added).[8] The Supreme Court "[did] not question that this type of harm may amount to an 'injury in fact' sufficient to lay the basis for standing under § 10 of the APA." Id. However, having found "a cognizable interest," the Court held that the Sierra Club had not established that its members were "among the injured." Id. at 734-35, 92 S.Ct. 1361. As the Court explained, "[t]he impact of the proposed changes in the environment of Mineral King will not fall indiscriminately upon every citizen. The alleged injury will be felt directly only by those who use Mineral King and Sequoia National Park, and for whom the aesthetic and recreational values of the area will be lessened by the highway and ski resort." Id. at 735, 92 S.Ct. 1361 (emphasis added). "The Sierra Club failed to allege that it or its members would be affected in any of their activities or pastimes by the Disney development. Nowhere in the pleadings or affidavits did the Club state that its members use Mineral King for any purpose, much less that they use it in any way that would be significantly affected by the proposed actions of the respondents." Id.
 
 
 27
 Similarly, the plaintiffs in Lujan v. National Wildlife Federation lacked standing because their affidavits "state[d] only that one of [the Federation's] members use[d] unspecified portions of an immense tract of territory, on some portions of which mining activity has occurred or probably will occur by virtue of the governmental action," rather than making clear that a plaintiff used the smaller area of land that was allegedly threatened. 497 U.S. at 889, 110 S.Ct. 3177. In contrast, a plaintiff in Mountain States Legal Foundation, who established injury in fact based on aesthetic injury, stated "that he use[d] the forest [in question] for, inter alia, hiking, hunting, camping, fishing, observing wildlife, finding solitude, and picking berries." 92 F.3d at 1234 (citations omitted). The plaintiffs in Committee for Auto Responsibility, who also successfully established their injury in fact, "claim[ed] that they or their members live in or near the District of Columbia and regularly travel to educational, cultural and recreational facilities within the immediate vicinity of the Great Plaza [parking lot]." 603 F.2d at 998; see also Montgomery Environmental Coalition, 646 F.2d at 578 ("[The Coalition's] members include residents of Maryland, Virginia, and the District of Columbia, by whose shores the Potomac River flows. We may take judicial notice of the fact that that river can be seen and smelt from those shores, and even that, as an important source of drinking water, it can be tasted.... Petitioners' members are users of the Potomac River, and their standing to challenge the Blue Plains and Seneca permits is clear.").
 
 
 28
 Other circuits have also recognized injury in fact based on injury to a plaintiff's interest in the quality and condition of an environmental area that he used. In Public Interest Research Group v. Powell Duffryn Terminals, Inc., 913 F.2d 64 (3d Cir.1990), the Research Group's members "resided in the vicinity of or owned property on or near the Kill Van Kull, or recreated on or near the Kill Van Kull," id. at 71. They successfully "claimed injury to their aesthetic and recreational interests because the Kill Van Kull [was] polluted." Id. One member alleged that he "was particularly offended by the brown color and bad odor of the water. He stated that he would birdwatch more frequently and enjoy his recreation on the Kill Van Kull more if the water were cleaner." Id. In Sierra Club v. Simkins Industries, Inc., 847 F.2d 1109 (4th Cir.1988), the "Sierra Club submitted the affidavit of member John Railey attesting to his interest, as one regularly using and enjoying the Patapsco River and surrounding land, in preserving the environmental integrity of the river," id. at 1112. Mr. Railey established Article III injury based on an affidavit alleging that:
 
 
 29
 " 'My interest, use or enjoyment of the Patapsco River and surrounding area includes preserving the health, safety and welfare of the river basin, preserving marine life and water integrity within the [332 U.S.App.D.C. 115] river, and eliminating odorous and unsightly illegal pollution. I regularly hike along the river. My activities and interests with respect to the Patapsco River have been adversely affected physically, aesthetically and emotionally by Simkin's [sic] Industries' failure to comply with its NPDES permit and resulting illegal pollution.' "
 
 
 30
 Id. at 1112 n. 3 & 1113 (citation omitted). Friends of the Earth v. Consolidated Rail Corp., 768 F.2d 57 (2d Cir.1985), recognized injury in fact based on the pollution of "Conrail's A.E. Perlman Yard in Selkirk, New York (Selkirk Yard), a diesel locomotive repair and refueling facility, which discharges treated wastes from its operations through point sources into the Hudson River and South Albany Creek," id. at 59, where the individual plaintiffs used the Hudson River and lived near its shores, see id. at 61; see also Save Our Community v. U.S. Environmental Protection Agency, 971 F.2d 1155, 1157, 1161 (5th Cir.1992) (per curiam) (finding injury in fact where plaintiff alleged aesthetic injury stemming from "the draining of several ponds on the site of a proposed expansion of a 73-acre landfill"); United States v. Metropolitan St. Louis Sewer District, 883 F.2d 54, 56 (8th Cir.1989) ("Missouri Coalition and two of its named members allege that many of the 25,000 members visit, cross, and frequently observe the bodies of water identified in the United States' complaint and that from time to time these members use these waters for recreational purposes. They also allege that these interests are adversely affected by the pollution of these waters. These allegations are sufficient to give the Coalition and its members constitutional standing...."); Chesapeake Bay Found. v. American Recovery Co., 769 F.2d 207, 209 (4th Cir.1985) (per curiam) ("[P]laintiffs here ... allege that their members resided in the vicinity of the affected waters and that those members 'recreate in, on or near, or otherwise use and enjoy' those waters.").
 
 
 31
 These myriad cases recognizing individual plaintiffs' injury in fact based on affronts to their aesthetic interests in observing animals living in humane habitats, or in using pristine environmental areas that have not been despoiled, articulate a second principle of standing. It has never been the law, and is not so today, that injury in fact requires the elimination (or threatened elimination) of either the animal species or environmental feature in question. In Sierra Club v. Morton, the Sierra Club did not allege that the Mineral King Valley would disappear in the wake of the challenged development, or that the desecration of the Valley would leave the Club's members with no other, pristine parks that they could conveniently use. See 405 U.S. at 734, 92 S.Ct. 1361. Yet the Supreme Court held that plaintiffs could establish injury in fact based on a decline in the quality and condition of one environmental area that they did use. See id.
 
 
 32
 To be sure, a number of cases that have recognized standing based on an aesthetic interest in the observation of animals have involved government action that allegedly threatened to diminish the overall supply of an animal species. See Defenders of Wildlife, 504 U.S. at 562, 112 S.Ct. 2130; Japan Whaling Ass'n, 478 U.S. at 231 n. 4, 106 S.Ct. 2860. But there is no case that we know of establishing that the elimination of a species or even the deaths of particular animals is an indispensable element of the plaintiffs' aesthetic injury, and we see no reason to import such a requirement into our standing doctrine so late in the day. Indeed, the standing cases that do stress the threat of diminished animal populations were those brought under conservation statutes whose mission is to preserve the number of animals in existence. See Defenders of Wildlife, 504 U.S. at 558, 112 S.Ct. 2130 ("[The Endangered Species Act] seeks to protect species of animals against threats to their continuing existence caused by man."); Japan Whaling Ass'n, 478 U.S. at 225, 106 S.Ct. 2860 ("Because of the [International Whaling Commission's] inability to enforce its own quota and in an effort to promote enforcement of quotas set by other international fishery conservation programs, Congress passed the Pelly Amendment to the Fisherman's Protective Act of 1967. Principally intended to preserve and protect North American Atlantic salmon from depletion by Danish fisherman in violation of the ban imposed by the International Convention for the Northwest Atlantic Fisheries, the [332 U.S.App.D.C. 116] Amendment protected whales as well."). It is not surprising, then, that the plaintiffs who brought suit to allege violations of these statutes would emphasize that the challenged agency action threatened to diminish the supply of an animal species, in contravention of the express purpose of those conservation statutes. In contrast, the Animal Welfare Act, with which we deal here, is explicitly concerned with the quality of animal life, rather than the number of animals in existence. It seeks "to promote the psychological well-being of primates." Pub.L. No. 99-198, § 1752, 99 Stat. 1354, 1645 (1985) (codified at 7 U.S.C. § 2143(a) (1994)) (emphasis added). Quite naturally, suits alleging violations of this statute will focus on the conditions under which animals live. Cf. ALDF II, 29 F.3d at 722 ("The primary purpose of the [Federal Laboratory Animal Welfare] Act is to ensure the humane care and treatment of various animals used in research or for exhibition or kept as pets. 7 U.S.C. § 2131. To this end, the Act requires, inter alia, that the Secretary of Agriculture 'promulgate standards to govern the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors.' Id. § 2143(a)(1)."). Along these lines, this court has already noted in Animal Welfare Institute, which recognized injury in fact based on an aesthetic interest in seeing animals living under humane conditions, that "[w]here an act is expressly motivated by considerations of humaneness toward animals, who are uniquely incapable of defending their own interests in court, it strikes us as eminently logical to allow groups specifically concerned with animal welfare to invoke the aid of the courts in enforcing the statute." 561 F.2d at 1007. Moreover, and perhaps more importantly, it does not make sense, as a matter of logic, to suppose that people suffer aesthetic injury from government action that threatens to wipe out an animal species altogether, and not from government action that leaves some animals in a persistent state of suffering. To the contrary, the latter seems capable of causing more serious aesthetic injury than the former.
 
 
 33
 Mr. Jurnove has adequately alleged injury to an aesthetic interest in observing animals living under humane conditions. His affidavit describes both the animal exhibition that he regularly visits, and the specific animals there whose condition caused Mr. Jurnove injury. It requires no expansion of existing standing doctrine to find that he has established a cognizable injury in fact.
 
 B. Causation
 
 34
 Plaintiffs allege that the AWA, 7 U.S.C. § 2143, requires the USDA to adopt explicit minimum standards to govern the humane treatment of primates, and that the agency did not do so. See First Amended Complaint pp 97, 106, 107. They further contend that the conditions that caused Mr. Jurnove injury complied with current USDA regulations, but that lawful regulations would have prohibited those conditions and protected Mr. Jurnove from the injuries that his affidavit describes. See id. pp 53, 58. We find that these allegations satisfy the causation prong of Article III standing.
 
 
 35
 As Mr. Jurnove's affidavit elaborates, he allegedly suffered aesthetic injury upon observing conditions that the present USDA regulations permit. Mr. Jurnove, for instance, "saw a large male chimpanzee named Barney in a holding area by himself. He could not see or hear any other primate." Jurnove Affidavit p 8. Mr. Jurnove also "viewed a monkey cage [containing one Japanese Snow Macaque] that was a distance from and not in view of the other primate cages." Id. p 14. As the plaintiffs observe, see First Amended Complaint pp 84, 95, 114-17, the housing of these two primates appears to be compatible with current regulations, which state only that "[t]he environment enhancement plan must include specific provisions to address the social needs of nonhuman primates of species known to exist in social groups in nature. Such specific provisions must be in accordance with currently accepted professional standards, as cited in appropriate professional journals or reference guides, and as directed by the attending veterinarian." 9 C.F.R. § 3.81(a) (emphasis added). Thus, an exhibition may apparently comply with the procedural requirement that this standard creates--by establishing a plan that "address[es]" the social needs of primates--and [332 U.S.App.D.C. 117] still leave a primate caged singly. Similarly, 9 C.F.R. § 3.81(a)(3) provides that "[i]ndividually housed nonhuman primates must be able to see and hear nonhuman primates of their own or compatible species unless the attending veterinarian determines that it would endanger their health, safety, or well-being." Here again, the regulation is structured so that an exhibitor that secured the approval of the veterinarian in its employ could comply with the regulation without actually housing nonhuman primates within the sight or sound of other primates. Contrary to the dissent, see Dissent at 451-52, plaintiffs do not suggest that the regulation is flawed simply because it leaves room for bribery in securing a veterinarian's consent to an exception; rather, they contend that the regulation gives exhibitors too much leeway to shop around for a compliant veterinarian and that placing such broad and unguarded discretion in the hands of the veterinarian in an exhibitor's own employ is an insufficient safeguard to protect primate well-being. Whatever the ultimate merits of the plaintiffs' case, they most definitely assert that the AWA requires minimum standards to prohibit or more rigidly restrict the occasions on which such allegedly inhumane treatment can occur.
 
 
 36
 Mr. Jurnove's affidavit also states that "[t]he pen next to the adult bears housed the squirrel monkeys.... I observed the monkeys repeatedly walking over to the door and sniffing and acting very upset when the bears came near." Jurnove Affidavit p 11. Plaintiffs allege that the current regulations permit the housing of incompatible species next to each other. See First Amended Complaint pp 46-47. Specifically, these regulations state that "[n]onhuman primates may not be housed with other species of primates or animals unless they are compatible." 9 C.F.R. § 3.81(a)(3) (emphasis added). This provision does not expressly regulate animals housed next to each other, but in separate cages. But even if section 3.81(a)(3) does apply to the situation that Mr. Jurnove observed, it includes the caveat that "[c]ompatibility of nonhuman primates must be determined in accordance with generally accepted professional practices and actual observations, as directed by the attending veterinarian," thus again permitting wide discretion on the part of the local veterinarian.
 
 
 37
 Similarly, Mr. Jurnove's affidavit observes that "[t]he only cage enrichment device [a Japanese Snow Macaque] had was an unused swing." Jurnove Affidavit p 14. The plaintiffs allege that such a situation is perfectly legal under the present regulations, see First Amended Complaint p 84, which provide only that "[t]he physical environment in the primary enclosures must be enriched by providing means of expressing noninjurious species-typical activities." 9 C.F.R. § 3.81(b). The regulations do not include any specific requirements governing the particular kind or number of enrichment devices. According to the plaintiffs, providing only a single swing, and one that the primate appears to shun, offends the AWA's mandate for minimum standards, although it is perfectly compatible with 9 C.F.R. § 3.81(b).[9]
 
 
 38
 The USDA's own actions in this case further support the plaintiffs' allegation that the agency's current regulations allow the conditions that allegedly caused Mr. Jurnove injury. As Mr. Jurnove's affidavit makes clear, the Game Farm has repeatedly submitted to inspection by the USDA. The allegedly inhumane conditions at the Game Farm have persisted precisely because the USDA inspectors [332 U.S.App.D.C. 118] have concluded on the basis of these visits that in every important aspect the conditions at the Game Farm comply with the USDA regulations. If the USDA had found the Game Farm out of compliance with current regulations, or if the governing regulations had themselves been more stringent, the Game Farm's owners would have been forced (in order to remain in accord with the law) to either alter their practices or go out of business and transfer their animals to exhibitors willing to operate legally; either scenario would protect Mr. Jurnove's aesthetic interest in observing animals living under humane conditions. Instead, however, the USDA has not questioned the legality of the Game Farm's plan since 1992. Since May 1995, when Mr. Jurnove began visiting the Game Farm and complaining to the agency, the USDA inspectors have examined, and largely approved, the actual conditions at the facility at least four times. The USDA's first inspection report "states that [the USDA inspectors] found the facility in compliance with all the standards." Jurnove Affidavit p 18. Although subsequent inspection reports identify a few conditions that Mr. Jurnove agrees violate the USDA regulations, the USDA continued--in at least three more inspection reports--to conclude that the Game Farm was in compliance with existing USDA regulations in all other respects, including presumably the existence of a plan that met the regulations' standards.[10]
 
 
 39
 Supreme Court precedent establishes that the causation requirement for constitutional standing is met when a plaintiff demonstrates that the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries, if that conduct would allegedly be illegal otherwise. For instance, Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), stated in describing earlier cases that:
 
 
 40
 The complaint in [Association of ] Data Processing [Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970),] alleged injury that was directly traceable to the action of the defendant federal official, for it complained of injurious competition that would have been illegal without that action. Accord, Arnold Tours, Inc. v. Camp, 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970); Investment Co. Institute v. Camp, 401 U.S. 617, 620-621, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971). Similarly, the complaint in Data Processing's companion case of Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), was sufficient because it alleged extortionate demands by plaintiffs' landlord made possible only by the challenged action of the defendant federal official. See id., at 162-163, 90 S.Ct. 832.
 
 
 41
 Id. at 45 n. 25, 96 S.Ct. 1917. Japan Whaling Association, in turn, recognized the standing of plaintiffs who claimed aesthetic injury (there, injury to their interest in whale watching) based on the government's failure to adequately regulate a third party (there, the United States's failure to certify that the Japanese whaling industry was exceeding its quota under international law). See 478 U.S. at 231 n. 4, 106 S.Ct. 2860.
 
 
 42
 This circuit's case law confirms the proposition that a plaintiff satisfies the causation prong of constitutional standing by establishing [332 U.S.App.D.C. 119] that the challenged agency rule permitted the activity that allegedly injured her, when that activity would allegedly have been illegal otherwise. Louisiana Energy and Power Authority ("LEPA") v. FERC, 141 F.3d 364 (D.C.Cir.1998), for instance, involved LEPA's challenge to a FERC decision that allowed one of LEPA's competitors to sell electric energy at unregulated rates, thus allegedly freeing this competitor "to use predatory pricing to lure away LEPA's customers," id. at 366. In holding that LEPA had standing to sue, this court first noted that " 'petitioners sufficiently establish their constitutional standing by showing that the challenged action authorizes allegedly illegal transactions.' " Id. at 367 (quoting Associated Gas Distributors v. FERC, 899 F.2d 1250, 1259 (D.C.Cir.1990)). It went on to elaborate that "[a] party need not prove that the agency action it attacks is unlawful ... in order to have standing to level that attack. As we said in Claybrook v. Slater, 111 F.3d 904, 907 (D.C.Cir.1997), '[w]hether a plaintiff has a legally protected interest (and thus standing) does not depend on whether he can demonstrate that he will succeed on the merits.' " Id. at 368. Similarly, Telephone and Data Systems, Inc. v. FCC, 19 F.3d 42 (D.C.Cir.1994), recently explained that "one narrow proposition at least is clear: injurious private conduct is fairly traceable to the administrative action contested in the suit if that action authorized the conduct or established its legality," id. at 47. International Ladies' Garment Workers' Union v. Donovan, 722 F.2d 795 (D.C.Cir.1983), also held that the appellants had established their standing to sue because "the relief sought by appellants would make the injurious conduct of third parties complained of in this case illegal; only by taking extraordinary measures--i.e., violating the law or starting new businesses overseas--could third parties prevent redress of the appellants' injuries," id. at 811; see also National Wildlife Federation v. Hodel, 839 F.2d at 705 ("[M]ere indirectness of causation is no barrier to standing, and thus, an injury worked on one party by another through a third party intermediary may suffice.... It is well settled that a plaintiff has standing to challenge conduct that indirectly results in injury.... We are concerned here not with the length of the chain of causation, but on [sic] the plausibility of each of the links that comprise the chain.") (citations and quotation marks omitted).
 
 
 43
 A question was raised at oral argument about whether Mr. Jurnove has nonetheless failed to satisfy the causation prong of constitutional standing, on the ground that the governing law simply permits the conditions that allegedly injured him, rather than requiring animal exhibitors to follow the allegedly inhumane practices. The background condition governing animal exhibitors, this argument proceeds, is that anything the exhibitors do is legal unless statutes and regulations make specific conduct illegal. Because neither the AWA nor the USDA's implementing regulations have changed this status quo-- i.e., in no way have they affected the conditions that allegedly injured Mr. Jurnove--there is no causal link between any government action and Mr. Jurnove's injury.
 
 
 44
 This argument, however, is founded on a false premise. The proper comparison for determining causation is not between what the agency did and the status quo before the agency acted. Rather, the proper comparison is between what the agency did and what the plaintiffs allege the agency should have done under the statute. The plaintiffs' legal theory of this case, which we accept for purposes of determining Mr. Jurnove's standing, is grounded on their view that animal exhibitors are in fact governed by a mandatory legal regime. Specifically, the plaintiffs allege that the AWA requires the USDA to establish specific, mandatory requirements that establish humane living conditions for animals. See 7 U.S.C. § 2143(a) (1994) (directing the Secretary of Agriculture to "promulgate standards to govern the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors" and providing that these standards "shall include minimum requirements" for "a physical environment adequate to promote the psychological well-being of primates") (emphasis added). According to this view, the AWA itself prohibits the conditions that allegedly injured Mr. Jurnove, and the [332 U.S.App.D.C. 120] USDA regulations misinterpret the statute by permitting these conditions. See First Amended Complaint pp 53, 57, 97, 106, 107. Both the Supreme Court and this circuit have repeatedly found causation where a challenged government action permitted the third party conduct that allegedly caused a plaintiff injury, when that conduct would have otherwise been illegal. Neither court has ever stated that the challenged law must compel the third party to act in the allegedly injurious way. In Investment Co. Institute v. Camp, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971), for instance, investment companies had standing to challenge a regulation from the Comptroller of the Currency that "authorize[d]," but did not require, "banks to establish and operate collective investment funds," id. at 618-19, 91 S.Ct. 1091 (emphasis added). In Arnold Tours, Inc. v. Camp, 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970) (per curiam), independent travel agents had standing to contest "a ruling by the Comptroller that, incidental to their banking services, national banks may provide travel services for their customers," id. at 45, 91 S.Ct. 158 (emphasis added). Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), involved plaintiffs who were allegedly "suffering irreparable injury under the [challenged] regulation because it provide[d] their landlord 'with the opportunity to demand that [they] and all those similarly situated assign the [upland cotton program] benefits in advance as a condition to obtaining a lease to work the land,' " id. at 163, 90 S.Ct. 832 (emphasis added). In Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), data processing service organizations had standing to challenge a regulation providing that "national banks ... may make data processing services available to other banks and to bank customers," id. at 151, 90 S.Ct. 827 (emphasis added).
 
 
 45
 In this circuit, Bristol-Myers Squibb Co. v. Shalala, 91 F.3d 1493 (D.C.Cir.1996), explicitly rejected the distinction between permissive and mandatory government regulation. There, the plaintiff challenged the legality of Food and Drug Administration ("FDA") regulations governing the approval of new generic drugs. This court found that Bristol-Myers Squibb ("BMS") had standing to sue, on the ground that "[i]f BMS is correct [about its claim that the FDA's regulations violate the governing statute], then it is no answer to say that the FDA is merely permitting a competitive product to enter the market and leaving the purchasing decision to the consumer. See Telephone and Data Systems, Inc. v. FCC, 19 F.3d 42, 47 (D.C.Cir.1994) ('injurious private conduct is fairly traceable to the administrative action contested in the suit if that action authorized the conduct or established its legality')." Id. at 1499 (emphasis added). The dissent seeks to distinguish Bristol-Myers Squibb Co. from the present case on the ground that, in the earlier case, the FDA had authorized the distribution of a drug under a legal regime in which no new drug could be marketed without such government approval. See Dissent at 453. In other words, Bristol-Myers Squibb Co. involved a situation in which private action that was once regulated loosely, or not at all, by the federal government, was now prohibited unless specifically permitted. The plaintiff in Bristol-Myers Squibb Co. claimed that the FDA's exercise of its authorization authority in that instance violated its statutory mandate. See 91 F.3d at 1494-95. The dissent has provided no sound grounds for distinguishing the present case. Under the plaintiffs' legal theory in this case, which we accept for purposes of determining their standing to sue, the AWA itself prohibits the allegedly inhumane conditions that injured Mr. Jurnove; the regulatory backdrop for the plaintiffs' claim is that all private exhibitions that involve inhumane treatment of animals are already illegal by statute. Thus here, the plaintiffs are also contending that the USDA's decision to permit the conditions that allegedly injured Mr. Jurnove violated the agency's statutory mandate.
 
 
 46
 Motor & Equipment Manufacturers Association ("MEMA") v. Nichols, 142 F.3d 449 (D.C.Cir.1998), involved a challenge to EPA regulations governing on-board emissions diagnostic devices ("OBDs"). These regulations provided that any car manufacturer who complied with California's stricter OBD [332 U.S.App.D.C. 121] requirements would be " 'deemed-to-comply' " with the federal government's OBD requirements. Id. at 452. The manufacture of cars meeting California's OBD standards was likely to injure the petitioners (who manufacture, rebuild, and sell spare parts) financially, but the EPA argued that its regulation had not caused this injury because the "deemed-to-comply" policy did not compel auto manufacturers to comply with California's OBD regulations, but simply permitted them to do so. See id. at 457. This court rejected that argument, pointing out the incentives that car manufacturers have to take the "deemed-to-comply" route, which allows them to "make one kind of each car they sell instead of two kinds, one of which would be for sale in states that follow California's OBD regulations, and the other for sale in states that follow federal OBD regulations." Id. We found causation, in other words, although the government regulation allowed, rather than required, the allegedly injurious third-party conduct, and we also recognized the incentives that third parties often have to minimize their expenditure of money and effort. Some animal exhibitors have similar incentives, of course, to comply with the bare requirements of the governing USDA regulations without exceeding them in any potentially expensive or time-consuming way.
 
 
 47
 Along the same lines, the plaintiffs in Telephone and Data Systems, Inc. had standing to challenge the FCC's grant of "a conditional permit" that allowed a competitor "to construct and operate cellular communications services in the Atlantic City market," but did not require him to do so. 19 F.3d at 44. Similarly, the plaintiffs in International Ladies' Garment Workers' Union had standing to challenge a Labor Department regulation that permitted the employment of people working in their homes in the knitted outerwear industry, but did not require manufacturers to employ these workers. See 722 F.2d at 799.
 
 
 48
 Mr. Jurnove's affidavit accordingly falls well within our established causation requirement for constitutional standing. He alleges that the USDA failed to adopt the specific, minimum standards that the AWA requires. He further describes how the conditions that caused him injury complied with current USDA regulations, and alleges that regulations complying with the AWA would have prohibited those conditions and protected him from the injuries that his affidavit recounts.
 
 C. Redressibility
 
 49
 We also find that Mr. Jurnove has satisfied the redressibility element of constitutional standing. Mr. Jurnove's affidavit alleges that he has a current routine of regularly visiting the Game Farm and provides a finite time period within which he will make his next visit, stating that he plans to "return to the Farm in the next several weeks" and to "continue visiting the Farm to see the animals there." Jurnove Affidavit p 43. As the plaintiffs' complaint argues, more stringent regulations, which prohibit the inhumane conditions that have consistently caused Mr. Jurnove aesthetic injury in the past, would necessarily alleviate Mr. Jurnove's aesthetic injury during his planned, future trips to the Game Farm. See First Amended Complaint pp 53, 58. Tougher regulations would either allow Mr. Jurnove to visit a more humane Game Farm or, if the Game Farm's owners decide to close rather than comply with higher legal standards, to possibly visit the animals he has come to know in their new homes within exhibitions that comply with the more exacting regulations.
 
 
 50
 The Supreme Court's recent decision in FEC v. Akins, moreover, rejects the possible counterargument that the redressibility element of constitutional standing requires a plaintiff to establish that the defendant agency will actually enforce any new binding regulations against the regulated third party. There, the plaintiffs, "a group of voters with views often opposed to those of AIPAC [the American Israel Public Affairs Committee]," sought to have AIPAC classified as a "political committee" within the meaning of the Federal Election Campaign Act ("FECA"), which "imposes extensive recordkeeping and disclosure requirements upon groups that fall within the Act's definition of a 'political committee.' " 118 S.Ct. at 1781-82. The FEC argued that these plaintiffs had not established [332 U.S.App.D.C. 122] either causation or redressibility, on the ground that, even if the Commission had accepted the plaintiffs' interpretation of FECA, "it is possible that ... [the FEC] would still have decided in the exercise of its discretion not to require AIPAC to produce the information." Id. at 1786. The Supreme Court soundly rejected this argument, noting:
 
 
 51
 that fact does not destroy Article III 'causation' [or redressibility,] for we cannot know that the FEC would have exercised its prosecutorial discretion in this way. Agencies often have discretion about whether or not to take a particular action. Yet those adversely affected by a discretionary agency decision generally have standing to complain that the agency based its decision upon an improper legal ground. If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case--even though the agency (like a new jury after a mistrial) might later, in the exercise of its lawful discretion, reach the same result for a different reason.
 
 
 52
 Id. (citations omitted).
 
 
 53
 Mr. Jurnove, accordingly, has met all three of the constitutional requirements for standing.
 
 D. Prudential Standing/Zone of Interests
 
 54
 Mr. Jurnove also falls within the zone of interests protected under the AWA's provisions on animal exhibitions. As the Supreme Court has recently reaffirmed, the zone of interests test is generous and relatively undemanding. "[T]here need be no indication of congressional purpose to benefit the would-be plaintiff." National Credit Union Admin. v. First National Bank & Trust Co., 522 U.S. 479, ----, 118 S.Ct. 927, 934, 140 L.Ed.2d 1 (1998) (citation and quotation marks omitted). Instead, the test, a gloss on APA § 10(a), 5 U.S.C. § 702 (1994), asks only "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected by the statute," National Credit Union Admin., 118 S.Ct. at 935 (citation, internal quotation marks, and alteration omitted); see also Akins, 118 S.Ct. at 1783 ("[P]rudential standing is satisfied when the injury asserted by a plaintiff arguably falls within the zone of interests to be protected or regulated by the statute in question.") (citation, internal quotation marks, and alterations omitted). Our circuit has further explained that "[t]his analysis focuses, not on those who Congress intended to benefit, but on those who in practice can be expected to police the interests that the statute protects." Mova Pharmaceutical Corp. v. Shalala, 140 F.3d 1060, 1075 (D.C.Cir.1998); see also ALDF I, 23 F.3d at 502 ("The [zone of interests] test precludes review of administrative action if the particular interest asserted is 'so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.' ") (quoting Clarke v. Securities Indus. Ass'n, 479 U.S. 388, 399, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987)); Autolog Corp. v. Regan, 731 F.2d 25, 29-30 (D.C.Cir.1984) ("[T]he zone of interests test requires some indicia--however slight--that the litigant before the court was intended to be protected, benefitted or regulated by the statute under which suit is brought. Courts should give broad compass to a statute's zone of interests in recognition that this test was originally intended to expand the number of litigants able to assert their rights in court.") (citations and internal quotation marks omitted).
 
 
 55
 In this case, logic, legislative history, and the structure of the AWA, all indicate that Mr. Jurnove's injury satisfies the zone of interests test. The very purpose of animal exhibitions is, necessarily, to entertain and educate people; exhibitions make no sense unless one takes the interests of their human visitors into account. The legislative history of both the 1985 amendments to the Animal Welfare Act and the 1970 act that first included animal exhibitions within the AWA confirms that Congress acted with the public's interests in mind.
 
 
 56
 In introducing the 1985 amendments, Senator Robert Dole explained "that we need to ensure the public that adequate safeguards are in place to prevent unnecessary abuses to animals, and that everything possible is being done to decrease the pain of animals during experimentation and testing." 131 [332 U.S.App.D.C. 123] CONG. REC. 29,155 (1985) (statement of Sen. Dole) (emphasis added). The Congressmen who went on the House floor to introduce the act that first extended the AWA to cover animal exhibitions recognized that their bill "ha[d] been a focal point of concern among animal lovers throughout the Nation for some time" and spoke of the "great pleasure" that animals bring to the people who see them. 116 CONG. REC. 40,159 (1970) (statement of Rep. Mizell); see also H.R. REP. No. 91-1651, at 1 (1970) ("Beginning with the legislation passed in 1966 (Public Law 89-544), the United States Government has implemented a statutory mandate that small helpless creatures deserve the care and protection of a strong and enlightened public.") (emphasis added). Indeed, Congress had placed animal exhibitions within the scope of the AWA after hearings documenting how inhumane conditions at these exhibitions affected the people who came and watched the animals there. See Care of Animals Used for Research, Experimentation, Exhibition, or Held for Sale as Pets: Hearings on H.R. 13957 Before the Subcomm. on Livestock and Grains of the House Comm. on Agriculture, 91st Cong. 38 (1970) (letter from John M. Mehrtens) [hereinafter Hearings]; id. at 39 (letter from Chris Sullivan); id. at 67 (statement of Pearl Twyne); id. at 79 (statement of Mary Frances Morrisette).
 
 
 57
 Throughout, the Congressmen responsible for including animal exhibitions within the AWA encouraged the continued monitoring of humane societies and their members. They spoke, for instance, of how America had long depended on humane societies to bring the mistreatment of animals to light. See, e.g., 116 CONG. REC. 40,305 (1970) (statement of Rep. Whitehurst). The Congressmen further acknowledged that humane societies were the moving force behind the legislation to include animal exhibitions within the AWA. See, e.g., 116 CONG. REC. 40,156 (1970) (statement of Rep. Foley).
 
 
 58
 The structure of the AWA also makes clear that Mr. Jurnove falls within the statute's zone of interests. While the AWA establishes oversight committees with private citizen members for research facilities, see 7 U.S.C. § 2143(b)(1) (1994), it created no counterpart for animal exhibitions. But, as the legislative history shows, the AWA anticipated the continued monitoring of concerned animal lovers to ensure that the purposes of the Act were honored. Mr. Jurnove, a regular viewer of animal exhibitions regulated under the AWA, clearly falls within the zone of interests the statute protects. His interests are among those that Congress sought to benefit through the AWA, and he certainly is one of the individuals "who in practice can be expected to police the interests that the statute protects." Mova Pharmaceutical Corp., 140 F.3d at 1075.
 
 III. CONCLUSION
 
 59
 Mr. Jurnove has standing to sue. He satisfies the injury, causation, and redressibility elements of constitutional standing, and also falls within the zone of interests for the Animal Welfare Act. We accordingly have no need to consider the standing of the other individual plaintiffs. We leave a determination of the merits of the plaintiffs' claim to a future panel of this court.
 
 
 60
 So ordered.
 
 
 61
 Circuit Judge SENTELLE, with whom Judge SILBERMAN, Judge GINSBURG, and Judge KAREN LeCRAFT HENDERSON join, dissenting:
 
 
 62
 Marc Jurnove visited the Long Island Game Farm about a dozen times over the course of a year and was upset by the conditions of the primates he saw there. Some primates were kept in isolation; others were kept in cages without sufficient "cage enrichment devices"; and still others were kept in cages that were not properly maintained. At Jurnove's urging, the United States Department of Agriculture inspected the Game Farm several times, but failed to take steps to improve these conditions. Frustrated by USDA's ineffectiveness, Jurnove filed a lawsuit seeking the invalidation of federal regulations concerning the treatment of primates on the grounds that those regulations failed to live up to the mandate of the Animal Welfare Act. At issue is whether Jurnove had standing to bring this suit.
 
 
 63
 [332 U.S.App.D.C. 124] The majority concludes that Jurnove has a cognizable constitutional interest in viewing particular primates kept under humane conditions, and finds Jurnove's claimed injuries fairly traceable to USDA's failure to promulgate tougher regulations and redressable by a judicial order forcing USDA to promulgate such regulations. Because I believe the majority significantly weakens existing requirements of constitutional standing, I dissent.
 
 I.
 
 64
 Under Article III of the Constitution, the "judicial power" of the United States is limited to the resolution of "Cases" or "Controversies." U.S. Const. art. III, § 2. Like the other doctrines of justiciability associated with Article III (for example, mootness, ripeness and political question), the doctrine of standing "state[s] fundamental limits on federal judicial power in our system of government." Allen v. Wright, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Standing--"perhaps the most important of these doctrines," id.--involves the question of "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Id. at 750-51, 104 S.Ct. 3315 (quoting Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).
 
 
 65
 At an "irreducible minimum," Article III standing requires those invoking the jurisdiction of a federal court to demonstrate an (1) injury-in-fact; (2) which is caused by, or is fairly traceable to the defendant's alleged unlawful conduct; and (3) which is likely to be redressed by a favorable decision of the court. Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); see also Bennett v. Spear, 520 U.S. 154, 117 S.Ct. 1154, 1161, 137 L.Ed.2d 281 (1997); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). A would-be federal litigant must "clearly and specifically set forth facts sufficient to satisfy these Art. III standing requirements." Whitmore v. Arkansas, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990).
 
 
 66
 By imposing these requirements, Article III limits the power of the federal judiciary to "those disputes which confine federal courts to a role consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process." Valley Forge, 454 U.S. at 472, 102 S.Ct. 752 (quoting Flast v. Cohen, 392 U.S. 83, 97, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968)); see also Allen, 468 U.S. at 750, 104 S.Ct. 3315 (case-or-controversy doctrines are "founded in concern about the proper--and properly limited--role of the courts in a democratic society") (quoting Warth, 422 U.S. at 498, 95 S.Ct. 2197). Article III standing is "not merely a troublesome hurdle to be overcome if possible so as to reach the 'merits' of a lawsuit which a party desires to have adjudicated." Valley Forge, 454 U.S. at 476, 102 S.Ct. 752. To the contrary, it is an "essential and unchanging part of the case-or-controversy requirement of Article III." Defenders of Wildlife, 504 U.S. at 560, 112 S.Ct. 2130.
 
 
 67
 A federal court deciding matters outside the scope of Article III, then, exercises power that is "not judicial ... in the sense in which judicial power is granted by the Constitution to the courts of the United States." Valley Forge, 454 U.S. at 471, 102 S.Ct. 752 (quoting United States v. Ferreira, 54 U.S. (13 How.) 40, 48, 14 L.Ed. 40 (1852)). To permit a federal court to rule on the claims of a plaintiff lacking Article III standing would "create the potential for abuse of the judicial process, distort the role of the Judiciary in its relationship to the Executive and the Legislature and open the Judiciary to an arguable charge of providing 'government by injunction.' " Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 222, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). Thus, "[t]he powers of the federal judiciary will be adequate for the great burdens placed upon them only if they are employed prudently, with recognition of the strengths as well as the hazards that go with our kind of representative government." Id.(emphasis added) (quoting Flast, 392 U.S. at 131, 88 S.Ct. 1942 (Harlan, J., dissenting)).
 
 
 68
 It is therefore imperative to exercise prudence when deciding a case--like the case before us today--that would lower existing Article III barriers to standing. We should not lightly tinker with the constitutional [332 U.S.App.D.C. 125] source of federal judicial power, see Whitmore, 495 U.S. at 161, 110 S.Ct. 1717, even when we may sympathize with the ideological goals of plaintiffs in a particular case. Id. (rejecting a "relaxed application of standing principles"; concluding that "[i]t is not for this Court to employ untethered notions of what might be good public policy to expand our jurisdiction in an appealing case").
 
 
 69
 With these principles in mind, I turn now to Marc Jurnove's claims of Article III standing.
 
 II.
 A. Injury-in-Fact
 
 70
 The first of the familiar triad of requirements for constitutional standing is "injury in fact," which is an "invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Defenders of Wildlife, 504 U.S. at 560, 112 S.Ct. 2130 (citations and internal quotation marks omitted). The majority concludes that Jurnove has articulated a "concrete and particularized" injury to his "legally protected interest" in "observing animals living under humane conditions." Majority at 438; see also First Amended Complaint p 43 (alleging that Jurnove has an "aesthetic, recreational, personal and educational interest in observing, photographing, writing about, learning about and interacting with wild and exotic animals kept in humane environments").
 
 
 71
 Despite the majority's assertion to the contrary, see Majority at 438-39, today's ruling is indeed a departure from existing aesthetic injury jurisprudence. Granted, "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." Defenders of Wildlife, 504 U.S. at 562-63, 112 S.Ct. 2130. However, as we have observed before, the Supreme Court cases addressing aesthetic injury resulting from the observation of animals are limited to cases in which governmental action threatened to reduce the number of animals available for observation and study. See Humane Society v. Babbitt, 46 F.3d 93, 97 (D.C.Cir.1995) (citing Sierra Club v. Morton, 405 U.S. 727, 734, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); Defenders of Wildlife, 504 U.S. at 563, 112 S.Ct. 2130; Japan Whaling Ass'n v. American Cetacean Soc'y, 478 U.S. 221, 231 n. 4, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986)).
 
 
 72
 Nor has this circuit previously crossed this diminution-of-the-species line and found the existence of a constitutional interest in the conditions under which one views animals. The majority misleadingly suggests that we did so in Animal Welfare Institute v. Kreps, 561 F.2d 1002, 1007 (D.C.Cir.1977). In fact, that decision does not make it at all clear what the nature of the injury is which the court found sufficient. On this cited page, under the heading "Traditional Analysis ... Injury in Fact," the court quoted more than a full column of the plaintiffs' complaint cataloging various allegations of injury. Without specifying what part of the plaintiffs' allegations of injury made out standing, the opinion goes on to note that "[t]he District Court agreed that appellants' interests were cognizable," but had held that appellants lacked standing because the injury was not personal to them, as opposed to being shared with "any other concerned citizen." Id. at 1008. Our opinion then goes on to discuss the sufficiency of the allegations that specific members of the plaintiff group intended to conduct the observations underlying their factual allegations. Insofar as the majority claims that our decision adopted the view that the conditions of observation constitute a cognizable interest such that interference therewith constitutes injury-in-fact for Article III standing purposes, the opinion simply will not bear that weight.
 
 
 73
 In that case, environmental groups had filed a lawsuit that challenged a decision by the Secretary of Commerce to waive a statutory moratorium on the taking or importation of marine mammals or marine mammal products. The result of the government's decision was to permit baby fur sealskins to be imported into the United States from South Africa. Id. at 1004. The plaintiffs alleged in their lawsuit that the government's action would "contribute to the death and injury of marine mammals and injury to the ecosystem of the South Atlantic Ocean." Id. at 1007. [332 U.S.App.D.C. 126] The plaintiffs articulated their aesthetic injury as follows:
 
 
 74
 Through sanctioning the seal harvesting method of the South African Government, the [Secretary's] decision impairs the ability of members of the Plaintiff organizations to see, photograph, and enjoy Cape fur seals alive in their natural habitat under conditions in which the animals are not subject to excessive harvesting, inhumane treatment and slaughter of pups that are very young and still nursing.
 
 
 75
 Id. (emphasis added). Citing Sierra Club, the Animal Welfare Institute court determined that the plaintiffs had stated a cognizable injury-in-fact. Id. at 1007-08.
 
 
 76
 The majority avers that the Animal Welfare Institute court recognized a cognizable interest in viewing seals free from inhumane treatment. Majority at 433-34. However, as the opinion makes clear, "inhumane treatment," as it appears in the above quotation and in the Marine Mammal Protection Act, is a term of art referring to the manner in which seals are killed: plaintiffs argued on the merits that "humane" killing of seals, within the meaning of that statute, involved killing with a single blow (and they argued, unsuccessfully, that South African harvesting practices did not live up to this degree of "humaneness"). See id. at 1012-13; 16 U.S.C. § 1362(4) (1975). Animal Welfare Institute, then, involved allegations that governmental action will "contribute to the death" of seals. Id. at 1007. Accordingly, this case falls squarely within the line of Supreme Court precedents recognizing claims of aesthetic injury to governmental action diminishing the opportunity to observe, not affecting the quality of the observation.
 
 
 77
 The majority also cites Humane Society v. Hodel, 840 F.2d 45 (D.C.Cir.1988), seemingly for the proposition that viewing animals free from inhumane treatment is a constitutionally cognizable injury. Majority at 434. But this case too comes within the Supreme Court's diminution-of-the-species parameters, specifically recognizing as cognizable the "deplet[ion] [of] the supply of animals and birds that refuge visitors seek to view." 840 F.2d at 52.
 
 
 78
 Although the Supreme Court and this circuit have not recognized a cognizable injury-in-fact to an aesthetic interest based on the circumstances of observation, that does not mean that interference with such an interest could not amount to a constitutional injury-in-fact. Rather, as I set forth above, I believe it is necessary to proceed with caution when venturing into constitutionally uncharted waters. See Section I., supra.
 
 
 79
 Having removed the diminution-of-the-species touchstone of existing case law, the majority opens an expanse of standing bounded only by what a given plaintiff finds to be aesthetically pleasing. Aesthetic injury is, by its nature, a matter of individual taste. For example, although Jurnove might find it aesthetically pleasing to view primates kept in groups, another person might prefer to watch them kept alone. Still another person might prefer to see primates in brightly colored cages, or in cages in which recordings of Mozart piano concertos are played around the clock, or not in cages at all. Under the majority's theory, it appears that Article III encompasses the injury of a person who states that he has an aesthetic interest in seeing primates kept under such conditions, and that he believes primates that are not kept under these conditions are treated inhumanely.
 
 
 80
 Jurnove's injury, recognized by the majority as constitutionally cognizable, is in seeing particular animals treated humanely. "Humane" is defined as "marked by compassion, sympathy, or consideration for other human beings or animals." WEBSTER'S NEW COLLEGIATE DICTIONARY 556 (1973). Humaneness, like beauty, is in the eye of the beholder: one's individual judgment about what is or is not humane depends entirely on one's personal notions of compassion and sympathy. I find it difficult to imagine a more subjective concept than this.
 
 
 81
 Furthermore, as the majority acknowledges, the reasoning of its opinion is not limited to humaneness. The majority recognizes an aesthetic injury in viewing animals in any manner that does not comport with a plaintiff's individual taste. According to the majority's theory, a sadist with an interest in [332 U.S.App.D.C. 127] seeing animals kept under inhumane conditions is constitutionally injured when he views animals kept under humane conditions. In so doing, the majority labors mightily, but unpersuasively, to limit the reasoning of its holding to the recognition of an aesthetic injury that results from the inhumane treatment of animals. For example, the majority disputes that the hypothetical sadist with an interest in seeing animals kept under inhumane conditions would be constitutionally injured by viewing animals kept under humane conditions. The majority explains the constitutional infirmity of the sadist's claims by stating that only "legally protected" injuries fall within the Article III injury-in-fact test. See Majority at 434 n.7 (citing Defenders of Wildlife, 504 U.S. at 560, 112 S.Ct. 2130). According to the majority, the sadist's injuries are not "legally protected" "because the [Animal Welfare Act] ... recognizes no interest in sadism." Id. But by relying on the nature of the injury recognized by a governing statute as "legally protected," the majority improperly conflates the prudential zone-of-interests analysis with the Article III injury-in-fact analysis. The majority's attempt to blend these conceptually distinct tests is logically incoherent, and in no way cures the ill-defined and essentially subjective nature of the asserted injury before us today.
 
 
 82
 In recognizing Jurnove's purely subjective injury, the majority radically departs from our precedent. For example, we refused to recognize "purely subjective" claims of injury that could not be measured by "readily discernible standards" in Metcalf v. National Petroleum Council, 553 F.2d 176, 187 (D.C.Cir.1977) (citing Laird v. Tatum, 408 U.S. 1, 13-14, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972)). One such "purely subjective" claim of injury in that case was raised by United States Senator Lee Metcalf. Metcalf claimed that the National Petroleum Council was unlawfully operating as a federal advisory committee because its membership was not "fairly balanced" as required by the Federal Advisory Committee Act. Metcalf, at the time the chairman of a Senate subcommittee on Minerals, Materials and Fuels, alleged that the Council was providing him with biased information, thus "imped[ing] [him] in his efforts to develop the best possible legislative product." Id. at 185-86.
 
 
 83
 In rejecting Metcalf's proposed injury in fact, we specifically targeted the "purely subjective nature of his asserted injury":
 
 
 84
 [Metcalf's] injury derives from his belief that he cannot produce the "best possible legislative product" because of the Council's allegedly tainted advice. There are no objective standards to determine when a legislative product is the "best" that it can be; such a determination necessarily rests on each legislator's individual view of the countless variety of factors which go into the formulation of legislation. Were we to accept the pure subjectivity put forth by appellant Metcalf in his capacity as an individual legislator, the federal courts would become a forum for the vindication of value preferences with respect to the quality of legislation enacted by our national legislature. Such a role for the courts is clearly inconsistent with the "cases or controversies" limitation of Article III.
 
 
 85
 Id. at 188.
 
 
 86
 Just as a legislator's view of what legislation is "best" depends solely on the value preferences of the legislator, so does Jurnove's notion of what is "humane" depend solely on his own value preferences. And no objective standard could possibly measure degrees of a concept--humaneness--that is based entirely on one's subjective emotions. Under existing law, a plaintiff may establish a "concrete and particularized" injury when his interest in observing or studying animals is directly affected by the reduction in the number of animals to be viewed or studied. Today's decision goes much further, recognizing an aesthetic injury based solely on a plaintiff's subjective emotional response to something he sees. Under today's decision, one's individual preference in viewing animals in a particular way is thought to be constitutionally injured when government regulations do not require the animals to be kept in a way that comports with one's taste. I would follow Metcalf and hold that such a purely subjective injury is outside the boundaries of Article III. The majority's contrary conclusion amounts to constitutional recognition [332 U.S.App.D.C. 128] of the "psychological consequence presumably produced by observation of conduct with which one disagrees." Valley Forge, 454 U.S. at 485, 102 S.Ct. 752. Valley Forge, among many other cases, makes it plain that this is "not an injury sufficient to confer standing under Art. III...." Id.; see also Humane Society v. Babbitt, 46 F.3d 93, 98 (D.C.Cir.1995) ("[G]eneral emotional 'harm,' no matter how deeply felt, cannot suffice for injury-in-fact for standing purposes.") (citing additional cases).
 
 
 87
 The majority accuses the panel opinion of "import[ing] ... a requirement into our standing doctrine so late in the day" by requiring a diminution in the opportunity to observe in order to establish cognizable injury to aesthetic interests. Majority at 437. This statement fundamentally misunderstands not only our precedent but the nature of standing. No one was "importing" a new requirement. We simply have not been asked before to find standing where the sole alleged injury is an interference with the aesthetic taste of the plaintiff. To pass on that novel question at its first appearance is not "late in the day." It is simply the first time it has been necessary to decide whether we will conclude that constitutional standing extends to an area in which it has not previously been asserted.
 
 
 88
 In short, Jurnove's asserted injuries are not "traditionally thought to be capable of resolution through the judicial process." See Valley Forge, 454 U.S. at 472, 102 S.Ct. 752 (quoting Flast, 392 U.S. at 97, 88 S.Ct. 1942). Accordingly, I would find that he has not met his burden of demonstrating a cognizable injury-in-fact. This conclusion alone would bar Jurnove from seeking relief in federal court. Florida Audubon Soc'y v. Bentsen, 94 F.3d 658, 662 (D.C.Cir.1996) (en banc).
 
 B. Causation
 
 89
 Even if I shared my colleagues' belief that an interference with a plaintiff's aesthetic sensibilities absent a diminution in the opportunity to exercise those sensibilities is sufficient to make out the injury-in-fact element of constitutional standing, I still could not conclude that the plaintiffs had established that Jurnove has constitutional standing on the present complaint. Even if such an injury were cognizable, and even if the complaint has set forth that cognizable injury, their attempt at standing stumbles at the second stile: they have not established causation.
 
 
 90
 In analyzing the "causation" element of constitutional standing, we ask whether it is "substantially probable" that the challenged acts of the defendant--as opposed, for example, to the acts of an absent third party--caused a plaintiff's particularized injury. Florida Audubon Soc'y, 94 F.3d at 663 (citations omitted). Causation, therefore, is related to but distinct from "redressability," which requires that the relief sought by the plaintiffs is likely to alleviate the plaintiff's injury. Id. at 663-64.
 
 
 91
 When a plaintiff asserts injuries attributed to "the government's allegedly unlawful regulation (or lack of regulation) of someone else," Defenders of Wildlife, 504 U.S. at 562, 112 S.Ct. 2130 (emphasis in original), the causation and redressability elements of standing analysis "require more exacting scrutiny." Freedom Republicans, Inc. v. Federal Election Comm'n, 13 F.3d 412, 416 (D.C.Cir.) (Wald, J.), cert. denied, 513 U.S. 821, 115 S.Ct. 84, 130 L.Ed.2d 36 (1994). Under these circumstances, standing is not necessarily precluded, but the "indirectness of injury 'may make it substantially more difficult to meet the minimum requirements of Art. III: to establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm.' " Id.(quoting Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 44-45, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)). A plaintiff who claims to have been injured by the government's regulation of a third party must "adduce facts showing that the unfettered choices made by independent actors have been or will be made in such manner as to produce causation and permit redressability of injury." Id. at 417 (brackets omitted) (quoting Defenders of Wildlife, 504 U.S. at 562, 112 S.Ct. 2130).
 
 
 92
 The majority concludes that Jurnove has met his burden of establishing that his claimed aesthetic injury is fairly traceable to government action. Jurnove's argument, accepted by the majority, proceeds: (1) Jurnove [332 U.S.App.D.C. 129] was aesthetically injured when he saw primates he believed to be mistreated at the Game Farm; (2) the manner in which the Game Farm treated the primates was permitted under existing regulations; (3) existing regulations are not tough enough because they do not include "minimum standards" as required by the Animal Welfare Act; (4) by failing to promulgate tough regulations that comply with the AWA, USDA is responsible for the aesthetic injuries Jurnove suffered by viewing primates at the Game Farm. Since Jurnove is asserting injuries attributed to the government's regulation of a third party, his claims of causation must be considered with "exacting scrutiny." Freedom Republicans, 13 F.3d at 416.
 
 
 93
 The cornerstone of Jurnove's claims of causation is that existing regulations permit the conditions that troubled him. Indeed, the majority stresses the fact that USDA's repeated inspections of the Game Farm revealed no (or few) violations.[1] See Majority at 439-40. However, the gravamen of the affidavit is not that the events Jurnove witnessed were legal, but that USDA is shirking its obligation to enforce the law, and is only halfheartedly inspecting the Game Farm in order to mollify Jurnove. Jurnove explicitly states that he has "concluded that the USDA was just 'going through the motions' to placate [him] because of [his] many calls and submissions [complaining about the treatment of Game Farm primates]." Jurnove Affidavit p 41. Furthermore, Jurnove states that he "knew that the USDA inspection report [finding the Game Farm in compliance with existing regulations] was incorrect." Id. at p 19; see also id. at p 21 (alleging that the USDA inspection report of July 21, 1995 included nothing about conditions that Jurnove says were "required by USDA regulations"). In light of the thrust of the affidavit (that USDA went through the motions and wrote up incorrect reports), Jurnove's legal claims of causation (that the regulations permitted the conditions he witnessed) seem disingenuous. See 10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2721, at 365 (1998) ("The formal issues framed by the pleadings are not controlling on a motion for summary judgment....").
 
 
 94
 According to the majority, causation is established if a plaintiff demonstrates that challenged governmental action "authorizes" the plaintiff's injuries. But the majority uses the term "authorize" in a very loose way. For example, 9 C.F.R. § 3.81(a)(3) provides that "[i]ndividually housed nonhuman primates must be able to see and hear nonhuman primates of their own or compatible species unless the attending veterinarian determines that it would endanger their health, safety, or well-being." According to the majority, this regulation authorized the Game Farm to house nonhuman primates out of the sight or hearing of other primates. Majority at 438.
 
 
 95
 The majority's view of "authorization" here is beyond expansive. The regulation [332 U.S.App.D.C. 130] says that individually housed primates must be able to see and hear other primates unless the attending veterinarian determines otherwise. Thus, one of two things must be true under existing law if a primate were housed out of the sight or hearing of other primates. Either the attending veterinarian determined that housing such a primate within the sight or hearing of another primate "would endanger their health, safety, or well-being," or the veterinarian did not, in which case the housing of the primate would violate the regulation. According to the majority, the regulation authorizes inhumane treatment of primates. How? An exhibitor that "secured the approval of the veterinarian in its employ could comply with the regulation without actually housing nonhuman primates within the sight or sound of other primates." Id. (emphasis added). The obvious innuendo of this sentence is that an exhibitor could bribe its staff veterinarian to determine falsely that a given primate's "health, safety, or well-being" would be endangered, thus permitting the primate to be housed away from the sight or sound of other primates.[2] But if this were so, any inhumane treatment would be the result of the exhibitor's failure to follow existing regulations, and would not be traceable to the regulations themselves.
 
 
 96
 The majority also addresses the causation of Jurnove's alleged aesthetic injury in seeing squirrel monkeys housed next to adult bears "repeatedly walking over to the door and sniffing and acting very upset when the bears came near." Jurnove Affidavit p 11. The majority acknowledges that under existing regulations, "[n]onhuman primates may not be housed with other species of primates or animals unless they are compatible." Majority at 439 (citing 9 C.F.R. § 3.81(a)(3)). It emphasizes, however, that this provision is not applicable here because it does not "expressly regulate" incompatible animals housed next to each other, but in separate cages. Id. The majority's causation analysis comes down to this: when a provision does not "expressly regulate" certain treatment, the regulations "authorize" such treatment. See also Majority at 442 (asserting that a regulation that included no "specific requirements governing the particular kind or number of enrichment devices" authorized the Game Farm's decision to furnish a cage with only one swing). Surely this analysis proves too much. There are an infinite variety of things not "expressly regulated" by section 3.81, and according to the majority's reasoning any injury caused by those things is fairly traceable to the government's failure to "expressly regulate" them. I cannot subscribe to such a wide-ranging theory of causation.
 
 
 97
 I find frightening at a constitutional level the majority's assumption that the government causes everything that it does not prevent. The majority rejects as "a false premise" the proposition that "[t]he proper comparison for determining causation is ... between what the agency did and the status quo before the agency acted." Majority at 441. I submit that consistent with our constitutional tradition of limited government that is precisely the correct premise for causation. The cases offered by the majority, Investment Co. Institute v. Camp, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971); Arnold Tours, Inc. v. Camp, 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970); and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), are not to the contrary. In each of those decisions the alleged injury arose from conduct on the part of a regulated entity whose conduct was expressly authorized by some regulation enacted by the sued regulator. Thus, there was an express authorization caused by the government defendants. In the present case, Jurnove has pointed to no such express authorization of any conduct that inflicts his alleged injuries.
 
 
 98
 [332 U.S.App.D.C. 131] Nor do decisions of our circuit sweep into causation the full expanse of all conduct not forbidden by the alleged causer. Bristol-Myers Squibb Co. v. Shalala, 91 F.3d 1493 (D.C.Cir.1996), did not, as the majority claims, "explicitly reject[ ] the distinction between permissive and mandatory government regulation." Majority at 442. That case involved regulations that governed the approval of new generic drugs which could not be marketed under relevant conditions without the regulator's approval. Bristol-Myers, 91 F.3d at 1494-95. In light of the fact that the regulator explicitly authorized the conduct at issue, there was a neat causal fit between the authorization and the act that allegedly caused the injury.
 
 
 99
 Telephone and Data Systems, Inc. v. FCC, 19 F.3d 42 (D.C.Cir.1994), upon which the Bristol-Myers court and derivatively the majority today rely, is also not to the contrary. It supports the distinction between the authorization of particular conduct and the failure to prevent it. In Telephone and Data Systems, the FCC had entered an order which authorized the operation of a licensed entity under certain conditions, and another which would merely allow the transfer of a particular license. In the portion cited by the majority, we held that an appellant allegedly injured by the conduct expressly authorized by the FCC in the first order had made out causation. Id. at 47. In a portion of the opinion not cited by the majority, we held that the same appellant had not made out causation in its allegation of potential anticompetitive collusion on the part of the potential transferee. Id. at 48. In no part of the opinion did we provide any precedent for the proposition that a bare failure to prevent conduct by regulation is tantamount to causation.
 
 
 100
 The remainder of the cases cited by the majority are simply a repetition of the same refrain. See Motor & Equipment Manufacturers Assoc. v. Nichols, 142 F.3d 449, 457 (D.C.Cir.1998) (holding that a competitive injury was fairly traceable to EPA's deemed-to-comply rule because the regulation "create[d] a tremendous incentive for manufacturers to install [on-board emissions diagnostic devices] that comply with California's regulations in all their cars"); Louisiana Energy and Power Authority v. FERC, 141 F.3d 364, 367 (D.C.Cir.1998) (holding that a competitive injury was fairly traceable to FERC's decision to "lift regulatory restrictions on their competitors"); International Ladies' Garment Workers' Union v. Donovan, 722 F.2d 795, 799 (D.C.Cir.1983) (holding that the petitioners had standing to challenge the Secretary of Labor's decision to "rescind longstanding restrictions on the employment of workers in their homes (homeworkers) in the knitted outerwear industry"). In each of these cases, we reasoned that the commercial conduct of third parties was fairly traceable to the government, because the conduct was expressly authorized by the government's economic regulation. In contrast, Jurnove can point to no such authorization. It is no answer to say that USDA's regulations do not prohibit the allegedly inhumane conditions that he observed at the Game Farm. What matters, under our consistent case law, is whether the third party conduct follows directly on the heels of a government decision that affirmatively approved that conduct. Jurnove has made no such submission.
 
 C. Redressability
 
 101
 I would further hold that Jurnove fails the test of redressability. To explain why I find his claims of redressability wanting, I offer this example. Jurnove claims that he was aesthetically injured by viewing primates with inadequate cage enrichment devices. In particular, he states that he was disturbed by viewing a Japanese Snow Macaque housed in a cage with only one such cage enrichment device: an unused swing. Jurnove Affidavit p 14. He takes issue with the existing regulation concerning such devices because they violate the Animal Welfare Act's minimum standards mandate. The regulation provides that "[t]he physical environment in the primary enclosures must be enriched by providing means of expressing noninjurious species-typical activities." 9 C.F.R. § 3.81(b). According to Jurnove (and the majority), these regulations authorized the Game Farm to keep primates in an offensive single-swing cage.
 
 
 102
 [332 U.S.App.D.C. 132] To find redressability on Jurnove's claims would require that we ignore the well-established rule that Article III standing requires it to "be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Bennett v. Spear, 520 U.S. 154, 117 S.Ct. 1154, 1163, 137 L.Ed.2d 281 (1997); accord Defenders of Wildlife, 504 U.S. at 560-61, 112 S.Ct. 2130.
 
 
 103
 How would a judicial order invalidating section 3.81(b) and directing USDA to promulgate a new regulation redress Jurnove's claims of aesthetic injury? Under Jurnove's theory, to comply with the "minimum standards" mandate of the AWA, the new regulation would require certain specific cage enrichment devices to be included. But due to the fuzzy nature of Jurnove's asserted injury, it would require sheer speculation to presume that any enrichment devices specified in a future regulation would satisfy Jurnove's aesthetic tastes. We only know that Jurnove does not like seeing primates kept in cages with only one enrichment device. We do not know what conditions would satisfy his individual taste. We do not know, for example, how many enrichment devices Jurnove would prefer to see, or of what type.
 
 
 104
 This problem--how could we possibly know whether a future regulation comports with Jurnove's aesthetic interests--is directly related to the nature of Jurnove's claimed injury itself. When an animal viewer asserts an aesthetic interest in not seeing a species diminished, it is easy to tell when that injury is redressed: a judicial order may prevent the government from diminishing the species. But when, as here, a plaintiff asserts that a regulation has injured an unquantifiable interest (the plaintiff's own taste), it seems to me nearly impossible to redress such an injury by a general court order directing the government to try again.
 
 
 105
 Furthermore, as the majority acknowledges, an order directing USDA to promulgate tougher standards might result in the Game Farm's deciding to sell its primates to another exhibitor who is willing to abide by the new regulation. The majority views this scenario as "protect[ing] Mr. Jurnove's aesthetic interest in observing animals living under humane conditions." Majority at 440. It is difficult to fathom how this is so. As the majority acknowledges, Jurnove's interest is in seeing particular primates--that is, the Game Farm primates--kept under certain conditions. But if the Game Farm primates are sold to another exhibitor, presumably Jurnove (who "enjoy[s] seeing [animals] in various zoos and other parks near [his] home," Jurnove Affidavit p 7 (emphasis added)) would not be able to see the Game Farm primates at all, much less under humane conditions. The relief he seeks may well result in his not being able to view the Game Farm primates at all. This too undercuts Jurnove's claims of redressability.
 
 III.
 
 106
 Marc Jurnove says that he objects to a federal regulation because it permits results that offend his aesthetic interests. Due to the majority's expansive reading of standing doctrine,[3] Jurnove may ask a court to force USDA to promulgate a new regulation that comports with his individual notion of aesthetics. Jurnove's complaints, formerly addressable only by the political branches, may now be aired in federal court.
 
 
 107
 I am reminded of Justice Powell's remark that "[r]elaxation of standing requirements is directly related to the expansion of judicial power." United States v. Richardson, 418 U.S. 166, 188, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974) (Powell, J., concurring). Indeed, I believe Justice Powell's warnings concerning federal taxpayer or citizen standing have particular resonance here, and are worth quoting at length:
 
 
 108
 It seems to me inescapable that allowing unrestricted taxpayer or citizen standing would significantly alter the allocation of power at the national level, with a shift away from a democratic form of government. I also believe that repeated and essentially head-on confrontations between the life-tenured branch and the [332 U.S.App.D.C. 133] representative branches of government will not, in the long run, be beneficial to either. The public confidence essential to the former and the vitality critical to the latter may well erode if we do not exercise self-restraint in the utilization of our power to negative the actions of the other branches. We should be ever mindful of the contradictions that would arise if a democracy were to permit general oversight of the elected branches of government by a nonrepresentative, and in large measure insulated, judicial branch. Moreover, the argument that the Court should allow unrestricted taxpayer or citizen standing underestimates the ability of the representative branches of the Federal Government to respond to the citizen pressure that has been responsible in large measure for the current drift toward expanded standing. Indeed, taxpayer or citizen advocacy, given its potentially broad base, is precisely the type of leverage that in a democracy ought to be employed against the branches that were intended to be responsive to public attitudes about the appropriate operation of government. "We must as judges recall that, as Mr. Justice Holmes wisely observed, the other branches of the Government 'are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts.' Missouri, Kansas & Texas R. Co. v. May, 194 U.S. 267, 270, 24 S.Ct. 638, 48 L.Ed. 971 (1904)." Flast, 392 U.S. at 131, 88 S.Ct. 1942 (Harlan, J., dissenting).
 
 
 109
 Id. at 188-89, 94 S.Ct. 2940 (footnote omitted).
 
 
 110
 By expanding the definition of an Article III "Case" or "Controversy," the majority increases federal judicial power at the expense of that of the political branches. I dissent from the majority's unwarranted erosion of the standards for constitutional standing.
 
 
 
 [1]
 Audrey Rahn, a fourth individual plaintiff, also appeared before the district court in this case. However, Rahn's claim focused only on the USDA's allegedly inadequate enforcement of its existing regulations, an issue not before this court on appeal. See Animal Legal Defense Fund, Inc. v. Glickman, 943 F.Supp. 44, 51, 62-64 (D.D.C.1996)
 
 
 [2]
 The Animal Legal Defense Fund ("ALDF"), an animal welfare organization, alleges that the USDA violated the notice and comment provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553 (1994), by failing to provide adequate opportunity to comment on the agency's decision to require regulated entities to keep their plans at their own facilities, see 9 C.F.R. § 3.81(e)(3), thereby protecting these plans from disclosure under the Freedom of Information Act, 5 U.S.C. § 552 (1994). The panel opinion held that ALDF lacked standing to sue, and the in banc court limited itself to considering Marc Jurnove's standing
 
 
 [3]
 Although the crux of the plaintiffs' complaint alleges that the USDA failed to promulgate minimum standards as required by the AWA, the complaint also states that the USDA has inadequately enforced even its existing regulations, by allegedly failing to inspect facilities and by allegedly instructing its inspectors to avoid documenting violations. See First Amended Complaint pp 122-23. As the district court found, see 943 F.Supp. at 62-64, the USDA's decisions about whether to undertake enforcement actions are generally unsuitable for judicial review, see, e.g., Heckler v. Chaney, 470 U.S. 821, 831, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). The plaintiffs have not appealed that judgment to this court
 
 
 [4]
 The district court also held that ALDF had standing to sue in its own capacity on its notice and comment claim, see 943 F.Supp. at 53-54, and found for ALDF on the merits, see id. at 61-62
 
 
 [5]
 The dissent attempts to limit Animal Welfare Institute to support standing only where the challenged governmental action is "diminishing the opportunity to observe [the animal], not affecting the quality of the observation." Dissent at 448. This statement does not accurately reflect either the injury alleged in Animal Welfare Institute or this court's holding in that case. In articulating the nature of their aesthetic injury, the Animal Welfare Institute plaintiffs alleged an interest in observing Cape fur seals who lived under "not ... inhumane" conditions, 561 F.2d at 1007--in other words, an interest in the quality of animal life, rather than the quantity of animals alive. To be sure, the "inhumane treatment" that concerned these particular plaintiffs revolved, as the dissent notes, around the manner in which the seals were being killed. See id. at 1012-13. But this fact does not reduce the plaintiffs' claim to one challenging the government only for causing the diminishment of an animal population. To the contrary, the plaintiffs in Animal Welfare Institute were alleging aesthetic injury based on how the Cape fur seals were living and how they were dying; the plaintiffs did not simply focus on the fact that the seals were, in fact, dying. Moreover, in holding that the plaintiffs' aesthetic interests would satisfy the requirements of standing if the plaintiffs could establish that they were among the injured, this court never distinguished between the plaintiffs' claims based on the quality of animal life and those based on the number of animals in existence
 
 
 [6]
 Not surprisingly, the dissent also reads Humane Society v. Hodel to support standing only where the challenged governmental action has or will deplete the supply of an animal population. See Dissent at 448. In fact, the case explicitly rejects that reading. The complaint in Humane Society v. Hodel stated both "that the existence of hunting on wildlife refuges forces Society members to witness animal corpses and environmental degradation" (a claim based on the quality of the aesthetic experience of observing animals) and that the challenged hunting regulations also "deplet[ed] the supply of animals and birds that refuge visitors seek to view" (a claim based on the number of animals in existence). 840 F.2d at 42. This court, moreover, clearly recognized both of these claims, stating: "These are classic aesthetic interests, which have always enjoyed protection under standing analysis." Id. (emphasis added)
 
 
 [7]
 It was suggested, not altogether facetiously, at oral argument that recognition of an aesthetic interest in observing animals might be problematic because it could encapsulate the aesthetic interest of a sadist in seeing animals living under inhumane conditions and the injury he suffered upon seeing particular animals living in a humane environment. There is a major difficulty with this argument. The meaning of "injury in fact" under our constitutional standing test does not incorporate every conceivable aesthetic interest. To the contrary, our standing jurisprudence defines injury in fact as "an invasion of a legally protected interest." Defenders of Wildlife, 504 U.S. at 560, 112 S.Ct. 2130 (emphasis added). Thus, if the hypothetical sadist challenged the regulations at issue here (presumably, for being too protective of animal welfare), he would not be able to establish injury in fact because the AWA, the relevant statute, recognizes no interest in sadism. To the contrary, it requires dealers, exhibitors, and research facilities to treat animals humanely. See 7 U.S.C. § 2143. This sadist would also find his claim immediately excluded under the APA, which only grants standing to people "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702 (1994) (emphasis added); see also Clarke v. Securities Indus. Ass'n, 479 U.S. 388, 394, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987); Association of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153-54, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); ALDF II, 29 F.3d at 723; ALDF I, 23 F.3d at 499
 The dissent attempts further to build on the suggestion put forth at oral argument that no one should be able to establish constitutional standing based on an aesthetic interest in observing animals living under humane conditions because definitions of what is "humane" may differ so widely. See Dissent at 448-49. But the dissent, again, forgets that not every aesthetic interest can form the basis for a lawsuit; our injury-in-fact test protects only those aesthetic interests that have been "legally protected." 504 U.S. at 560, 112 S.Ct. 2130. At its heart, the dissent's complaint may reflect a fear that the AWA does not do enough to define what it means by "humane," although the statute does indicate, in its sections focusing on animal research, a particular concern with minimizing "animal pain and distress." See, e.g., 7 U.S.C. § 2143(a)(3)(A). Yet "humane" does convey a basic meaning of compassion, sympathy, and consideration for animals' health, safety, and well-being, and it is not that unusual for this court to apply relatively broad statutory language to particular claims by looking to the normal usage of words, even when different people may disagree as to their application to a variety of factual situations.
 
 
 [8]
 The Mineral King Valley "is designated as a national game refuge by special Act of Congress." 405 U.S. at 728, 92 S.Ct. 1361. The Sierra Club alleged, inter alia, "that various aspects of the proposed development contravene federal laws and regulations governing the preservation of ... game refuges." Id. at 730, 92 S.Ct. 1361
 
 
 [9]
 The United States argues that Mr. Jurnove has not demonstrated causation, on the ground that the above-described injuries are self-inflicted. The assertion appears to turn on the fact that Mr. Jurnove first traveled to the Game Farm "in [his] capacity as an equine investigator, [after being] apprised that several ponies needed to be checked on at that location." Jurnove Affidavit p 7. This argument may--or may not--have merit with regard to equine mistreatment at the Game Farm. However, there is no need in this case to offer any opinion about whether so-called "self-inflicted" wounds can give rise to standing. According to Mr. Jurnove's uncontested affidavit, he visited the primates at the Game Farm, the subject of the present suit, out of an aesthetic interest in observing animals living under humane conditions. See id. ("Once [Mr. Jurnove] was there [at the Game Farm]," he decided "to look around at the other animals housed there" "in furtherance of [his] appreciation for exotic animals and [his] desire to observe and enjoy them.")
 
 
 [10]
 The dissent makes much of the fact that Mr. Jurnove occasionally expresses doubt in his affidavit about the soundness of the USDA's multiple determinations that the Game Farm was in compliance with essentially all of the relevant regulations, contending that "the thrust of the affidavit" is that "the USDA went through the motions and wrote up incorrect reports." Dissent at 451. This argument is flawed on two counts. First, Mr. Jurnove's affidavit is the wrong place to look for a statement of the plaintiffs' legal theory of this case. Mr. Jurnove is not a lawyer and his affidavit purports to articulate only his alleged injuries. The plaintiffs' legal arguments are put forth in their complaint, where they explicitly allege that the conditions at the Game Farm that caused Mr. Jurnove injury complied with the present USDA regulations. See First Amended Complaint pp 53, 58. Second, even if we were to look to Mr. Jurnove's affidavit to determine the plaintiffs' legal theory, the "thrust of the affidavit" is certainly not that the conditions at the Game Farm violated the USDA's regulations. Indeed, so far as the record before us reflects, no decisionmaking authority has ever made the determination that there are widespread regulatory violations at the Game Farm. And the USDA, the agency with regulatory control over the Game Farm, repeatedly came to the opposite conclusion, finding that the Game Farm was in legal compliance with the USDA regulations that the plaintiffs challenge here
 
 
 [1]
 I note that we are reviewing the district court's entry of summary judgment in favor of Jurnove and his co-plaintiffs. This fact determines our standard of review: "while a motion to dismiss may be decided on the pleadings alone, construed liberally in favor of the plaintiff, a motion for summary judgment by definition entails an opportunity for a supplementation of the record, and accordingly a greater showing is demanded of the plaintiff." Wilderness Society v. Griles, 824 F.2d 4, 16 (D.C.Cir.1987) (finding plaintiffs' allegations in summary judgment context to be insufficiently specific to meet their burden of establishing constitutional standing); see also Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 45 n. 25, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) (acknowledging that a complaint's standing allegations "withstood a motion to dismiss, although [they] might not have survived challenge on a motion for summary judgment"). Jurnove's affidavit was submitted in support of his motion for summary judgment. Rule 56(e) of the Federal Rules of Civil Procedure requires such affidavits to be "made on personal knowledge; [to] set forth such facts as would be admissible in evidence, and [to] show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). Clearly, Jurnove would not have been permitted to testify about the conclusions of USDA examiners (that the Game Farm was in compliance with regulations) because those conclusions are hearsay and not based on Jurnove's personal knowledge. However, because the government never filed a motion to strike the hearsay portions of Jurnove's affidavit, it waived its objections to them, and we may appropriately consider them now in the absence of a "gross miscarriage of justice." See 10B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2738, at 372-73 (1998)
 
 
 [2]
 The majority suggests, without record citation, that appellant's concern is not with bribery, but rather "that the regulation gives exhibitors too much leeway to shop around for a compliant veterinarian and that placing such broad and unguarded discretion in the hands of the veterinarian in an exhibitor's own employ is an insufficient safeguard to protect primate well being." Majority at 438-39. This does not change the applicable analysis. A claim of authorization through wide discretion is effectively the same as (or close enough to) authorization through failure to forbid as to fall far outside of the kind of express authorization required for Article III causation
 
 
 [3]
 The majority concludes that Jurnove has established prudential standing, as well as constitutional. Because I do not believe Jurnove has established constitutional standing, I find it unnecessary to address prudential standing here